COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| | § | |
| LUIS CASTRUITA, | | No. 08-16-00030-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 168th District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC # 2014D02055) |
| | § | |

# **O P I N I O N**

Appellant was convicted of murder and sentenced to life imprisonment. He raises eight issues on appeal which can be boiled down to whether the trial court erred (1) in ruling on several suppression motions, (2) in limiting Appellant's voir dire question about gangs, (3) in admitting a piece of physical evidence, (4) in failing to grant a mistrial, and to sustain an objection concerning the State's closing argument, and (5) whether the cumulation of error, including claims of prosecutorial misconduct, merits reversal. We affirm.

## FACTUAL SUMMARY

This case arises from an early morning shooting that took the life of Efren Gonzalez. On March 22, 2014, Efren and two of his friends, Matthew Scarbrough and Ernesto Sapien, were at a bar celebrating another friend's birthday. They left the bar when it closed, and proceeded to walk

home. As they crossed a street, they saw an on-coming silver mini-van. By Matthew's account, the van sped up as if to strike them, but then stopped. Matthew quickly crossed the street in front of the mini-van and made eye contact with the driver. Efren and Ernesto stayed in the middle of the street and according to Ernesto, had an awkward moment, not knowing if they should cross or wait for the mini-van to pass. They ended up crossing in front of the mini-van and joined up with Matthew. The van proceeded forward, but then circled around and parked in front of Efren, Matthew, and Ernesto who by this time were walking across a parking lot.

According to Matthew, the mini-van's driver shouted, "what the f**k are you looking at?" at the three. The driver began having words with Efren. Matthew then saw the driver reach down and pull out a black handgun with a silver slide. Matthew jumped to the ground, heard a loud pop, and the mini-van drove off. The bullet pierced Efren Gonzalez's liver and he died several hours later in the hospital.

Matthew picked Appellant out of a photo line-up, and identified him at trial as the shooter. He testified that Appellant was alone in the SUV at the time of the shooting. Matthew also recalled the driver's distinctive clothing (a black shirt with "sheriff" in white lettering and a black cap). Ernesto also picked Appellant out of a photo line-up and positively identified him as the shooter at trial.[1]

At trial, the State presented additional evidence linking Appellant to the crime. Video from a nearby business showed a silver/light gray mini-van drive towards the crime scene at 2:25 a.m., and then back away two minutes later. In a nearby neighborhood, a silver/light gray mini-van was seen parked in front of a house where Appellant lives. The police asked Appellant to come outside

---

[1] Ernesto was only "35% sure" of his photo line-up identification because in the photograph, Appellant had a shaved head but at the time of the shooting, had long hair coming out from underneath a black baseball cap. He testified that he was 100% sure of his in-court identification.

2

and surrender himself. Instead, he climbed out a second story window onto the roof, jumped to the roof of a neighbor's house, but eventually climbed down and surrendered to police.[2] The police obtained a search warrant for the house and found a black handgun with a silver slide hidden inside a DVD player in Appellant's bedroom. A spent bullet found at the scene had rifling marks indicating that it was fired from that same hand-gun.

Appellant's girlfriend testified that he left their house that night at 12:45 to 1:00 a.m. to bring back some food. He returned empty handed about two hours later, wearing a black-cap and black t-shirt with the word "sheriff" in white lettering.[3] He was acting "frantic," exemplified by looking out the windows with binoculars, and constantly checking the house's surveillance cameras. She explained that Appellant hid *his* gun inside their DVD player. Appellant told his girlfriend that he "smoked" somebody, adding "That's what happens when you don't pay up," and "That's what happens when you f**k with the devil." He asked her to wash the clothes he had on that night, and to look in the mini-van for the shell casing. While Appellant was in jail awaiting trial, he requested a transfer to a different jail cell. In his conversation with the detention officer, he volunteered that he had shot someone that was bothering him.

Appellant testified at trial, and claimed that he picked up another person ("Mr. Robinson") that night, who was the actual shooter.[4] Appellant left his house about 2:00 a.m. after getting a

---

[2] A detective testifying at a suppression hearing added that Appellant climbed down only after he was told the police were there on a probation violation warrant: "I tell him you have a warrant for probation. He said that's it? I said that's the one you have right now outstanding. There may be some traffic warrants. And he immediately jumped off the roof and walked right to me."

[3] The black shirt with "sheriff" was not found at the address, but while surveilling the residence, the police did see Appellant bring a plastic bag out of his house and hand it to an unknown person, who drove away with the bag after the shooting.

[4] In his testimony, Appellant initially only referred to a "person" who called him asking for a ride. His counsel first used the name "Mr. Robinson" and never used the person's surname. In cross-examination, the prosecutor identified Mr. Robinson with a surname. We choose not to state the surname in this opinion so as not to cast aspersions on a person not convicted of this crime.

3

call from Mr. Robinson who needed help because his car's battery was not working. As he got close to the car's location, he saw Mr. Robinson walking (oddly enough along a street named "Robinson") and picked him up. Mr. Robinson commented that he had been arguing with someone. As they began driving, three persons "cut in front" of them, and Mr. Robinson said that these were the individuals in question. The three persons positioned themselves to force Appellant to turn into a parking lot. Mr. Robinson then jumped to the back of the mini-van. One of the trio began hitting the back of the vehicle and one person came to the passenger side window. Appellant then claimed to have heard the gunshot. Appellant and Mr. Robinson left the scene to jump-start Mr. Robinson's vehicle. Mr. Robinson then went his own way, but left the gun in Appellant's mini-van. Appellant got scared and hid the gun in his DVD player when he got home. He denied ever wearing a black shirt with "sheriff" lettering on it. He also claimed he was too scared to call the police, but did call Mr. Robinson to come pick up his gun. He denied making any of the statements attributed to him by his girlfriend and the detention officer.

The jury found Appellant guilty. In the punishment phase, the State admitted evidence of Appellant's prior felony conviction for possession with intent to distribute more than 1000 kilograms of marijuana. The State also admitted evidence of an additional conviction for a 2002 family violence assault, along with a judgment revoking probation in that case. Yet another witness testified that in 2012 while he was walking along the street, Appellant pulled in front of him in a vehicle, and shot at him four times, striking him once in the arm. The pedestrian had never met Appellant before, nor was there any apparent motive for the shooting. A Gang Intelligence Coordinator told the jury that Appellant admitted to being "Barrio Azteca" which is a Texas prison gang, and threatened to "activate his rank" if the jail did not agree to place him in a cell with another Barrio Azteca inmate. The State offered evidence that a baggy with almost ten

4

grams of methamphetamine was found in the DVR in Appellant's room, alongside the gun. When the police searched the room, they also noticed a puppy sitting motionless in the corner. Appellant's girlfriend said the dog could not stand on its leg after Appellant kicked it down a flight of stairs. Appellant had also dragged her outside by her hair, and threatened to throw her and the dog off a balcony.

Appellant called several siblings who testified that he was a good brother to them. He also marshalled testimony from a former employer who praised his work, and a psychiatrist who suggested that Appellant has a treatable psychiatric condition.

The jury sentenced Appellant to life imprisonment along with a $10,000 fine. He raises eight issues challenging that judgment of conviction. We address his issues in a slightly different order.

## THE SUPPRESSION ISSUES

In Appellant's sixth and seventh issues, he challenges the trial court's ruling denying a pre-trial motion to suppress a videotaped interrogation, claiming that the statement was not given voluntarily (Issue Six) and that he was denied the right to counsel (Issue Seven). In Appellant's eighth issue, he challenged the admissibility of a statement made to a detention officer while he was awaiting trial. He claims that the statement was given without *Miranda*[5] warnings, and was not taken in accordance with the requirements of TEX.CODE CRIM.PROC.ANN. art. 38.22 (West 2018). The trial court denied all of Appellant's motions to suppress.

### Standard of Review

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex.Crim.App. 2010). That discretion is tested under a bifurcated

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 442-44, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5

standard of review as articulated in *Guzman v. State*, 955 S.W.2d 85 (Tex.Crim.App. 1997). *See Amador v. State*, 221 S.W.3d 666, 673 (Tex.Crim.App. 2007); *Krug v. State*, 86 S.W.3d 764, 765 (Tex.App.--El Paso 2002, pet. ref'd). "At a motion to suppress hearing, the trial judge is the sole trier of fact and judge of credibility of witnesses and the weight to be given to their testimony." *Lerma v. State*, 543 S.W.3d 184, 190 (Tex.Crim.App. 2018). Accordingly, we give almost total deference to the trial court's resolution of questions of historical fact, especially when those determinations are based on assessments of credibility and demeanor. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex.Crim.App. 2013). Likewise, we give deference to trial court rulings that apply the law to the facts if those determinations turn on credibility or demeanor. *Arguellez*, 409 S.W.3d at 662. We review *de novo* mixed questions of law and fact that do not turn on credibility and demeanor. *Id.*

Where, as here, the trial court does not make explicit findings of fact, we "review the evidence in a light most favorable to the trial court's ruling" and "assume that the trial court made implicit findings of fact supported in the record that buttress its conclusion." *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex.Crim.App. 2000); *see also Lerma*, 543 S.W.3d at 190. Regardless of whether the motion to suppress was granted or denied, the prevailing party is entitled to "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *State v. García-Cantu*, 253 S.W.3d 236, 241 (Tex.Crim.App. 2008). An appellate court may uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex.Crim.App. 2007).

## The Videotaped Interview

On the day after the murder, the police received a tip that Appellant was the shooter and were informed of where he lived. Detectives watched the house, and believed that Appellant might

6

be inside. When they saw Appellant's mother drive away from the house in the mini-van, they initiated a traffic stop and a detective asked her to come to the station. She agreed, and while at the station, she was asked to telephone Appellant to ask him to come out of the house and talk to the police.

Following the mother's call, Appellant left the house through a second story window, but was eventually talked down and surrendered himself. When taken to the police station, two detectives attempted to interview Appellant. They informed him that they were investigating a homicide, and informed him of his right to remain silent and right to counsel. Appellant invoked his right to counsel and the interview was concluded. He was placed in a holding cell, but about thirty minutes later requested to use the restroom.

A detective escorted him to the restroom, and in doing so, walked him past his mother who was still at the police station. Appellant had earlier stated his belief that his mother was under arrest. One of the detectives had corrected Appellant, and told him that she was not under arrest. The other detective testified that when he saw his mother, he told her everything was fine and that she should go home.[6]

When a detective returned Appellant to the holding cell, he indicated that he now wanted to tell the police what happened. The detective set up another videotaped interview, and again informed Appellant of his right to remain silent and right to counsel. Fifty minutes elapsed between the termination of the first interview and the start of the second. In the second interview, Appellant told the story of driving the mini-van to pick up a person known to him only as "Soldier" and that "Solider" shot Efren. In its case in chief, the State did not offer the statement into evidence, nor elicit any testimony about the contents of the statements.

---

[6] One detective testified that while the mother was first asked not to go back to her house while the search warrant was being executed, she later refused to leave station, and eventually had to be escorted outside.

### No Abuse of Discretion

Appellant claims that the detectives intentionally walked him by his mother to get him to give a statement. He argued there was something of a *quid pro quo* -- Appellant would recant his invocation of counsel in exchange for the police releasing his mother. The record, does not support that claim, nor overcome the implied findings to the contrary. While the detective could have escorted Appellant to the bathroom by a different route, we find little other evidence suggesting an improper action by the detectives. Nor is there any clear evidence from the suppression hearing that Appellant's decision to give the second statement had anything to do with a false belief that his mother was under arrest, or would be released in exchange for giving a statement. Instead, he appears to have known she was free to go, and stated that he originally would not give a statement because he did not know what the case was about. The record simply does not overcome any of the implied findings supporting the trial court's ruling, particularly given that the factual disputes largely turn on the credibility and demeanor of the detective witnesses. Appellant did not testify at the suppression hearing.

### No Harm

Moreover, we would reject this claim for a more fundamental reason: the State never introduced the statement at trial. *See Cacy v. State*, 901 S.W.2d 691, 701 (Tex.App.--El Paso 1995, pet. ref'd)(overruling complaint about warrant and affidavit because they were never admitted into evidence which would be a "logical predicate" to the complaint on appeal). Nor is there any indication that the police used information from the statement to uncover any of the other evidence introduced at trial. At most, when Appellant was being cross-examined, the State's prosecutor confirmed that Appellant had seen a copy of his original statement, and then asked him to agree that it was "roughly the version that you're giving this jury today." While there were several

8

discrepancies between the recorded statement and Appellant's trial testimony, the State never used those in cross examination. We disagree with Appellant's claim that he was compelled to testify because of the statement. By the close of the State's case, he would have known the statement was not offered into evidence, and he could have pursued another defense strategy if he chose. Even if the statement were taken in derogation of Appellant's right to counsel, we are convinced beyond a reasonable doubt that a statement never admitted into evidence, and only mentioned in passing before the jury, did not contribute to the conviction in this case. TEX.R.APP.P. 44.2(a). We overrule Issues Six and Seven.

### Statement Made to Detention Officer

In Issue Eight, Appellant challenges several of his statements overheard by a detention officer at the jail, including that he shot someone who was bothering him, and that he expected to be sentenced to no more than twenty-five years because he was not charged with capital murder. The statements arose out of Appellant's request to change jail cells.

While awaiting trial, Appellant was held on a regular lockup floor. He requested a transfer to another floor to be paired with another inmate who was considered a Barrio Azteca gang member. The request was relayed to Officer Otomi Cortez, the gang unit coordinator, who arranged to talk with Appellant in a visitation room. Appellant would have been handcuffed or shackled. The conversation was not recorded, nor would Officer Cortez have read Appellant his rights.

During the meeting, Appellant explained that he wanted to room with a particular prisoner because they knew each other. Appellant told Officer Cortez that he was not actively a member of Barrio Azteca, but "also wasn't a ex man." That statement made no sense to Officer Cortez, because "You're either active or you're not." Officer Cortez was skeptical of Appellant's gang

9

affiliation and was not going to grant the transfer request. In response, Appellant made additional statements, including that he "would activate [his] sergeant stripes and start taking care of business." Officer Cortez believed this was a suggestion that Appellant could cause trouble if he did not get his way. Appellant also volunteered that "he had shot someone [for which] he'd probably do 25 years because it wasn't capital murder." Officer Cortez viewed these statements as efforts to influence his decision whether to move Appellant or not. Officer Cortez denied that he was investigating Appellant's criminal case. Rather, his interest was focused on maintaining order at the jail.

### *Appellant's Argument*

Appellant contends that the interview at the jail constituted an interrogation, and absent *Miranda* warnings, and compliance with Article 38.22, any statements were inadmissible. We take it as a given that *Miranda* warnings are required whenever a person in custody is subjected to either express questioning or its functional equivalent (often short-handed as the "custodial interrogation" requirement). *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980). As a matter of state law, Article 38.22 also sets several preconditions for the admissibility of a defendant's statement, including that: (1) it is electronically recorded; (2) made only after designated warnings set out in Section 2(a) are given; and (3) the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings. TEX.CODE CRIM.PROC.ANN. art. 38.22 §§ 2(a), (b), and 3; *Thai Ngoc Nguyen v. State*, 292 S.W.3d 671, 676 (Tex.Crim.App. 2009). But as with the *Miranda* warnings, Article 38.22 applies only to statement made in a custodial interrogation. TEX.CODE CRIM.PROC.ANN. art. 38.22 § 5; *Herrera v. State*, 241 S.W.3d 520, 525-26 (Tex.Crim.App. 2007).

Appellant urges that he was in custody at the time (he was in jail) and the meeting with Officer Cortez was an interrogation. Appellant emphasizes that Officer Cortez testified that in some cases, the decision to transfer an inmate might involve issues overlapping the inmate's criminal case. At trial, Officer Cortez testified that he looked up Appellant on the jail computer before meeting with him.

### The Custody Element

The State first responds that Appellant was not in "custody" at the time he spoke with Officer Cortez. Despite being incarcerated in the jail at the time, the State's argument is not unfounded. The Texas Court of Criminal Appeals in *Herrera v. State* distinguished custody in the *Miranda* sense from its literal meaning, and held that the interview of a jail inmate is not *per se* a custodial interrogation. 241 S.W.3d at 525-26; *see also Howes v. Fields*, 565 U.S. 499, 508-09, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012)("As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."). Rather, a court should look to a number of factors to determine whether a prison inmate is in custody, including (1) the language used to summon the inmate, (2) the physical setting of the interrogation, (3) the extent to which the inmate is confronted with evidence of his or her guilt, (4) the additional pressure exerted to detain the inmate or the change in the surroundings of the inmate which results in an added imposition on the inmate's freedom of movement, and (5) the inmate's freedom to leave the interview and the purpose, place, and length of the questioning. *Herrera,* 241 S.W.3d at 532; *Fields*, 565 U.S. at 514, 132 S.Ct. at 1192 ("When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted.").

11

Our record does not address many of these factors. Officer Cortez interviewed Appellant in a visitation room. Appellant was cuffed or shackled. Otherwise, the record is bare as to the length of the interview, how Officer Cortez opened the discussion, how the interview was terminated, or what was said about Appellant's ability to end the interview. Appellant carries the initial burden to prove that a statement was the product of a custodial interrogation. *Wilkerson v. State*, 173 S.W.3d 521, 532 (Tex.Crim.App. 2005). Nonetheless, at the suppression hearing, the State's attorney conceded that Appellant was "in custody at the jail." It would seem unfair to fault Appellant for not developing a record on an issue the State never contested below. Accordingly, we note the importance of the "custody" element, but decline to reach the issue on this record.

### *The Interrogation Requirement*

The other part of a "custodial interrogation" is the requirement of an interrogation. Here, we agree with the State that an interview undertaken to decide a cell transfer issue was not an interrogation for the purposes of Appellant's criminal case.

An interrogation includes more than just express questioning; it also includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300-01, 100 S.Ct. at 1689-90. The proviso from *Innis* -- "other than those normally attendant to arrest and custody" -- is sometime referred to as the booking question exception. *Alford v. State*, 358 S.W.3d 647, 649 (Tex.Crim.App. 2012). Under the exception, "[q]uestions normally attendant to arrest, custody, or administrative 'booking' procedure do not constitute 'interrogation.'" *Cross v. State,* 144 S.W.3d 521, 524 n.5 (Tex.Crim.App. 2004); *see also Cedillo v. State*, 02-07-360-CR, 2008 WL 5265028, at *6 (Tex.App.--Fort Worth Dec. 18, 2008, pet. ref'd)(questions from officer at jail to clarify defendant's gang affiliation was not a

12

custodial interrogation, the interview was done for purposes of segregating gang members to maintain order in jail); *Pierce v. State*, 234 S.W.3d 265, 272 (Tex.App.--Waco 2007 pet. ref'd) (trial court did not err in admitting admission of gang affiliation made during jail's normal classification process). Under the booking question exception, the relevant inquiry is whether the question asked "reasonably relates to a legitimate administrative concern, applying an objective standard." *Alford*, 358 S.W.3d at 659-60.

Officer Cortez interviewed Appellant because he was requesting to be moved into a cell with a known gang member. The jail has an interest in segregating members of different gangs to maintain order in the jail. As a part of the interview process, Officer Cortez testified that sometimes he obtains background information on prisoners that he would interview, and sometimes not. He agreed that the inmates underlying offense may be relevant to a transfer request, *but it was not in this case*. The question that Cortez asked--why do you want to change jail cells -- is reasonably related to a legitimate administrative concern for maintaining order in the jail. Contrary to Appellant's claim, we fail to see how any of this testimony demonstrates some intent to use the transfer interview to elicit an incriminating response from Appellant. There is no direct connection between the circumstances of the murder and Appellant's desire to be housed with a friend. There is no indication the murder here was gang related. Moreover, there was no question asked of Appellant about his underlying charge -- the only testimony at the hearing was that Appellant volunteered information as he was somehow attempting to impress Officer Cortez.

### *Spontaneous Statements Are Not the Product of a Custodial Interrogation*

We also agree with the State that the two statements germane to the murder -- that Appellant shot someone who was bothering him and he only anticipated a twenty-five-year sentence -- were spontaneous statements. A statement which is unrelated to a custodial

13

interrogation is not a product of the investigation, and thus not governed by *Miranda* or Article 38.22. *See Dossett v. State*, 216 S.W.3d 7, 24 (Tex.App.--San Antonio 2006, pet. ref'd) (spontaneous statement made by defendant about a dream that linked him to a murder, made at end of custodial interrogation in an unrelated case, was admissible without new *Miranda* or Article 38.22 warnings); *Schuessler v. State*, 647 S.W.2d 742, 747 (Tex.App.--El Paso 1983), *rev'd on other grounds,* 719 S.W.2d 320 (Tex.Crim.App. 1986) (defendant while in custody for traffic offenses and mental health evaluation, gave narrative answer detailing how he strangled his daughter in response to officer's question about his marital status, and the volunteered admission was held admissible at his subsequent murder trial). We overrule Issue Eight.

## VOIR DIRE

In his first issue, Appellant complains that the trial court improperly limited his voir dire examination regarding the venire panel's view on gangs.

### Standard of Review and Applicable Law

We review the trial court's limitations on voir dire under the abuse of discretion standard. *See Barajas v. State*, 93 S.W.3d 36, 38 (Tex.Crim.App. 2002). A trial court may impose reasonable restrictions on exercising voir dire examination. *Thompson v. State*, 267 S.W.3d 514, 517 (Tex.App.--Austin 2008, pet. ref'd), *citing Boyd v. State*, 811 S.W.2d 105, 115 (Tex.Crim.App. 1991). Otherwise, "voir dire could go on forever without reasonable limits." *Barajas*, 93 S.W.3d at 38. Nonetheless, a trial court abuses its discretion when it limits a proper question concerning a proper area of inquiry. *Id.*; *Dinkins v. State*, 894 S.W.2d 330, 345 (Tex.Crim.App. 1995).

A proper area of inquiry includes discovery of a potential juror's views on any issue relevant to the case. *Sells v. State*, 121 S.W.3d 748, 756 (Tex.Crim.App. 2003); *Barajas*, 93

14

S.W.3d at 38. A question can be relevant if it seeks to uncover grounds for a challenge for cause. *Barajas*, 93 S.W.3d at 39. A proper area of inquiry also includes those questions that assist a party in intelligently exercising peremptory challenges. *Id.*; *Dhillon v. State*, 138 S.W.3d 583, 587 (Tex.App.--Houston [14th Dist.] 2004, pet. struck). But even if within a proper area of inquiry, the question must be properly phrased. The trial court has "discretion to restrict voir dire questions that are confusing, misleading, vague and broad, or are improper commitment questions." *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex.Crim.App. 2012), *citing Barajas,* 93 S.W.3d at 38-39.

### The Challenged Ruling

Defense counsel quizzed the venire panel on three hot-button issues: guns, drugs, and gangs. The jury was first asked if there were to be "testimony about guns or the use of guns, do you become unfair, not objective?" The trial court *sua sponte* asked the lawyers to approach the bench, stated that the question was "contracting," and directed that it would not permit the question even though the State was not objecting. Appellant's counsel then asked a similar question about street drugs: "Does that awaken a bias where you would not be fair in deciding the facts?" Neither the State nor the trial judge objected to that question.

Finally, and pertinent to the issue here, counsel asked about gang affiliation:

[DEFENSE COUNSEL]: Now, when you read the newspaper and see the news, it's hard to get by without reading something about gangs. Right? Does the notion about gangs inspire bias in anybody? No? Yes? All right. If gang involvement, testimony about gang involvement in a criminal case that you are listening to would make you biased and unable to be fair in making a decision, please raise your number. Stand up.

Two persons on the first row answered yes, but before counsel could inquire of the other rows, the State's counsel asked to approach the bench, where this exchange occurred:

[COURT]: I'm going to grant his preemptories [sic] if you don't object to his line of questioning.

15

[STATE'S ATTORNEY]: Well, I'm objecting, Judge. I'm objecting as to the drugs and as to this as well. I mean if they are for his preemptory [sic] use that's one thing, but as far as -- he's essentially violating his motion in limine. None of this testimony would come in in this part of the trial -- in the guilt/innocence phase. The gang, I've limined out. It's not relevant so I don't see any reason that I would be able to get it in. The drugs as well. There's meth found in his room when they find the gun. I also --

After a brief exchange, the trial judge and both counsel concurred that the gang testimony could come up in the punishment phase. The trial judge then stated that while Appellant could ask the question to intelligently exercise peremptory strikes ("for preemptory, [sic] that's fine"), the court was not going to call the venire members jurors back to clarify the responses or rehabilitate them on challenges for cause. When Appellant's counsel continued to argue that an affirmative answer would establish bias sufficient to support a for-cause challenge, the trial court sustained the objection:

[COURT]: Okay. I sustain the contracting.

[DEFENSE COUNSEL]: Excuse me.

[COURT]: I sustained the contracting objection.

[DEFENSE COUNSEL]: Okay. I would like to let the court know I propose to ask this question to each and every member of the remaining panel.

[COURT]: Go ahead.

[APPELLANT'S COUNSEL]: Thank you.

Counsel then moved on to another line of questions.[7]

Appellant now contends the trial judge's ruling restricted both his ability to strike objectionable jurors for cause, and to intelligently exercise peremptory strikes. As a preliminary matter, we turn to the State's forfeiture claim that the trial court did not restrict Appellant from

---

[7] At the end of Appellant's voir dire, his counsel appropriately asked a clean-up question, inquiring if there was any additional issue that any venire panel member needed to address. Three persons volunteered that they would be biased if a defendant was involved in gang or drug activity. The State's attorney then re-urged the contracting objection that the trial court sustained. Of the five persons who did respond to the gang question, three were struck for cause for other reasons, and Appellant exercised peremptory challenges on the remaining two.

16

asking further questions on this topic. Appellant told the trial court what he intended to do and the judge said, "go ahead."

The context of the discussion between the trial court and counsel convinces us that the trial court was open to questions seeking the panel's views on gangs that would allow for the intelligent exercise of peremptory challenges. But it was not accepting the form of the question to establish a basis to challenge for cause. With regard to Appellant's claim that he was denied the right to ask the question to intelligently exercise his peremptory challenge, we overrule the challenge either because the trial court would have allowed the question, or would have allowed a better worded question.

If a trial court merely limits a question due to its form, counsel must determine the basis of the limitation and attempt to fashion a question which complies with the trial court's concerns. *See Wright v. State*, 28 S.W.3d 526, 534 (Tex.Crim.App. 2000)("Although appellant is authorized to ask proper questions in a particular area of inquiry, he is not entitled to ask questions in any particular form. Because appellant did not follow through on this topic, we cannot say that the trial court improperly restricted his voir dire of this venire member."); *Howard v. State*, 941 S.W.2d 102, 110-11 (Tex.Crim.App. 1996)(op. on reh'g), *overruled in part on other grounds by Easley v. State*, 424 S.W.3d 535 (Tex.Crim.App. 2014)(where there is no absolute limitation placed on the underlying substance of a defendant's voir dire question, it is incumbent upon defense counsel to rephrase the improperly phrased query or waive the voir dire restriction); *Trevino v. State*, 815 S.W.2d 592, 600-01 (Tex.Crim.App. 1991), *rev'd on other grounds*, 503 U.S. 562, 112 S.Ct. 1547, 118 L.Ed.2d 193 (1992)(no error in restriction on voir dire pertaining to single question on guilt inference from indictment that could have been easily reworded); *Moncada v. State*, 960 S.W.2d 734, 737 (Tex.App.--El Paso 1997, pet. ref'd)(where no absolute limitation is

17

placed on underlying substance of defendant's voir dire question, defense counsel must rephrase the improperly phrased question or waive the voir dire restriction).

The restriction here was on a single question that could have been easily rephrased to elicit a venire member's strong views on gangs.[8] The other way to read the record is that the trial court would not have prevented the question even as asked for the purposes of exercising peremptory strikes (the "Go Ahead" response to Appellant's declaration he would ask the question to every venireperson). We therefore overrule Appellant's claim that the trial court abused its discretion in limiting his right to intelligently exercise peremptory strikes because of the gang question. That still leaves, however, the limitation on the question if asked for the purpose exercising a challenge for cause. As to that issue, the trial court was clear that the question would not support a strike for cause, and the trial court was not going to bring venire members up individually to explore their feelings based on that question. The Texas Court of Criminal Appeals' decision in *Barajas v. State*, however, answers this secondary issue.

This court initially heard *Barajas*, and held that a criminal defendant in an indecency with a child case could ask the venire members if they could be impartial in an indecency case involving a victim who was nine years old. *See Barajas*, 93 S.W.3d at 38 (describing our unpublished opinion). We relied on a line of cases going back to *Nunfio v. State*, 808 S.W.2d 482 (Tex.Crim.App. 1991). In *Nunfio*, the court held counsel could properly ask the panel whether it could be fair and impartial if the victim in the case was a nun. 808 S.W.2d at 485. On petition for

---

[8] Appellant could have just segregated out the first part of the inquiry he actually made ("Does the notion about gangs inspire bias in anybody?"). Alternatively, we have opined that the State in an intoxication manslaughter case could ask the venire members to rate the seriousness of intoxication manslaughter on a scale of one to ten with one being "it's not important" and ten being "it's real important." *Cardona v. State*, 08-07-00161-CR, 2009 WL 3153207, at *3 (Tex.App.--El Paso Sept. 30, 2009, no pet.)(not designated for publication). In *Standefer v. State*, 59 S.W.3d 177, 180 n.7 (Tex.Crim.App. 2001), the court distinguished from commitment questions an inquiry such as, "Have you known anyone who has been abused as a child?" Rephrased to fit this case, the panel might be asked, "Have you known anyone who has been a victim of gang violence, or been a member of a street gang?

discretionary review, the Texas Court of Criminal Appeals took the opportunity to overrule *Nunfio*, and reversed our decision applying it. 93 S.W.3d at 41. Two rationales from *Barajas* guide our decision today.

First, the *Barajas* court concluded the question "can you be fair and impartial under a given set of facts?" can constitute a "license to go fishing, without providing any concrete information for the intelligent use of peremptory or for-cause challenges." *Id*. at 41. That same rationale applies here. In effect, counsel asked little more than who is against street gangs? It would be more surprising to see who did not raise their hand to that question. It matters little that Appellant rephrased the fair and impartial question at issue in *Barajas* to ask, "would you be biased and unable to be fair in a decision." That question does not disclose what is being decided, nor does the question shed on any light on what the context of the gang testimony might be.

A second point made in *Barajas* also informs our decision. The *Barajas* court first asked what the "fair and impartial" question was relevant to. It suggested three possible purposes: (1) deciding if a juror could fairly determine guilt-innocence; (2) deciding how a juror might assess witness credibility; and (3) in assessing punishment. *Id*. at 39-40. If we consider those same three possible purposes in the context of this case, the question that Appellant asked would not support a viable challenge for cause.

A defendant would certainly want to know if a venire member is so biased against the defendant that they cannot fairly hear the guilt-innocence phase of the trial. For instance, in a sexual molestation of a child case, the defendant might appropriately ask "could you be fair and impartial in deciding guilt or innocence of a defendant" in a hypothetical case where there is evidence of sexual molestation of young children. *Lancaster v. State*, 319 S.W.3d 168, 170 (Tex.App.--Waco 2010, pet ref'd)(so holding); *see also Abron v. State*, 523 S.W.2d 405, 407

(Tex.Crim.App. 1975)(trial court abused its discretion in prohibiting defense counsel from asking whether the venire members would be biased because the defendant was black and the victim white). That rationale does not apply here, however, because there was no evidence of gang involvement in the guilt innocence phase of the trial.

A defendant might also want to know if a venire member is biased against the defendant or his or her witnesses such that they might automatically discredit their testimony. In *Hernandez v. State*, 508 S.W.2d 853, 854 (Tex.Crim.App. 1974), for instance, the court held that a defendant should have been allowed to ask, "Is there any member of the panel who, regardless of what the evidence showed in any case, could not believe that a police officer was telling a willful falsehood from the witness stand?" But that is not the type question that Appellant asked here, and his gang affiliation never came up during the guilt-innocence phase when his credibility was at issue. Nor were any of the witnesses he called in the punishment phase associated with gangs.

And if the question was relevant to assessing punishment (the third possible purpose discussed in *Barajas*), the trial court concluded the question was an improper commitment question. A commitment question is one "that commits a prospective juror to resolve or to refrain from resolving an issue a certain way after learning of a particular fact." *Davis v. State*, 349 S.W.3d 517, 518 (Tex.Crim.App. 2011). "Commitment questions are impermissible unless the law requires a commitment, and the law does not require a commitment on what factors a juror will consider during sentencing." *Id*. In *Barajas,* because the age of the child was a relevant consideration for punishment, the question would "determine whether venire members would consider the victim's age in assessing punishment" and as such, was improper because a party "may not seek to *commit* venire members to assess or refrain from assessing punishment on this basis." [Emphasis added]. *Id*. at 40.

20

By the same token, gang membership is a proper consideration for a jury to consider in the punishment phase of a trial. *Garcia v. State*, 126 S.W.3d 921, 928 (Tex.Crim.App. 2004)("Evidence of gang membership is relevant to show a defendant's bad character if the State can prove (1) the gang's violent and illegal activities and (2) the defendant's membership in the gang."); *Garcia v. State*, 239 S.W.3d 862, 866-67 (Tex.App.--Houston [1st Dist.] 2007, pet. ref'd)(collecting cases); *Valtierra v. State*, 08-14-00261-CR, 2016 WL 5121993, at *6 (Tex.App.--El Paso Sept. 21, 2016, no pet.)(not designated for publication)("Evidence of membership in a gang such as the Barrio Aztecas would come under the type of 'bad acts' relevant to sentencing . . . ."). For this reason, Appellant's question would not support a "for cause" challenge because a juror might consider gang affiliation as a legitimate sentencing factor. And like the question in *Barajas*, it would therefore be an improper commitment question.

We conclude the trial court did not abuse its discretion in precluding the question as asked for the purposes of a for-cause challenge. We also conclude that Appellant was not restricted in making appropriate inquiries so that he could intelligently exercise his peremptory challenges. We overrule Issue One.

**ADMISSION OF EVIDENCE**

In his second issue, Appellant complains of the admission of a pair of denim jeans that were found in the search of his room two days after the murder. When the State first offered the jeans into evidence, Appellant objected on relevance and lack of foundation grounds. The trial court sustained the foundation objection. In the colloquy before the trial court, however, the State's attorney told the judge the jeans contained gunshot residue (GSR). The State acknowledge that it was going to finish the foundation through another witness, and the trial judge stated, "And then we'll go from there." When Appellant's girlfriend later took the stand, the State had her identify

21

the jeans as a pair of Appellant's pants. The State then reoffered the jeans, and Appellant then objected for "no foundation . . . as to indicate that that is anybody's jeans besides a pair of jeans somewhere." The trial court overruled that objection. For reasons unclear in our record, the State never called an expert to testify to any GSR on the jeans, nor did the State otherwise show the relevance of the jeans to the case.

Appellant now contends that the trial court erred in admitting the jeans because they lack "evidentiary value." The argument specifically claims that the State failed to meet the requirements of TEX.R.EVID. 901 because (1) there was no evidence of GSR on the jeans, or (2) no showing the jeans were in the same condition as when the shooting occurred. Additionally, Appellant claims there was no evidence that he was wearing those jeans at the time of the shooting, and thus they cannot be relevant to the case.

### Preservation of Error

We do not reach the question of whether the trial court erred in admitting evidence unless error is preserved for our review. *See Martinez v. State,* 98 S.W.3d 189, 193 (Tex.Crim.App. 2003). To preserve the issue of erroneously admitted evidence, a party must make a timely and specific objection and obtain a ruling from the trial court. TEX.R.APP.P. 33.1(a); *Martinez,* 98 S.W.3d at 193. "The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial [court] of the basis of the objection and give [it] the opportunity to rule on it; [and] (2) to give opposing counsel the opportunity to respond to the complaint." *Resendez v. State,* 306 S.W.3d 308, 312 (Tex.Crim.App. 2009). A party "must be specific enough so as to 'let the trial [court] know what he wants, why he thinks himself entitled to it, and do so clearly enough for the [trial court] to understand him at a time when the trial court is in a proper position to do something about it.'" *Id.* at 313, *quoting Lankston v. State,* 827 S.W.2d 907, 909 (Tex.Crim.App. 1992).

22

Also, a party fails to preserve error when the contention urged on appeal does not comport with the specific complaint made in the trial court. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex.Crim.App. 2012), *citing Thomas v. State*, 723 S.W.2d 696, 700 (Tex.Crim.App. 1986). In determining whether a complaint on appeal comports with a complaint made at trial, we look to the context of the objection and the shared understanding of the parties at the time. *Lankston*, 827 S.W.2d at 911.

Appellant's issue stumbles on several of these principals. As the State points out, the objection raised when the jeans were admitted was only that the State had not shown that they were not some random pair of jeans. The State met that burden. It had earlier admitted without objection a photograph taken during the search of the Appellant's room that showed the jeans on the floor. Moreover, Appellant's girlfriend who was living with him at the time, identified the jeans as his. While Appellant correctly points out on appeal that something more was required (i.e. that the jeans had GSR, and that Appellant was wearing them at the time of the shooting), those issues were not raised in the trial court, and they are forfeited.

Moreover, even if there was a shared understanding that the jeans were being conditionally admitted subject to another witness tying the jeans to the crime, that claim is equally forfeited. TEX.R.EVID. 104 permits a court to admit evidence on the condition that proof of a fact making it relevant will be introduced later. *Fuller v. State,* 829 S.W.2d 191, 198-99 (Tex.Crim.App. 1992). If sufficient authentication or connection does not appear by the close of the proponent's evidence, the opposing party must renew the original objection by a motion to strike the conditionally admitted evidence. Failure to do so constitutes waiver by the opposing party for purposes of appeal. *See Powell v. State,* 898 S.W.2d 821, 829 (Tex.Crim.App.1994); *Heidelberg v. State*, 36

S.W.3d 668, 673 (Tex.App.--Houston [14th Dist.] 2001, no pet.)  Appellant failed to do so, and the issue is forfeited.

## Any Error Would Be Harmless

Even were we wrong in that regard, any error in admitting the jeans would be harmless. An appellate court must disregard a non-constitutional error that does not affect a criminal defendant's "substantial rights."  TEX.R.APP.P. 44.2(b); *Casey v. State*, 215 S.W.3d 870, 884-85 (Tex.Crim.App. 2007).  Under that rule, an appellate court may not reverse for non-constitutional error if the court, after examining the entire record, has a fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict.  *See Casey*, 215 S.W.3d at 884-85; *Garcia v. State*, 126 S.W.3d 921, 927 & n.9 (Tex.Crim.App. 2004)(noting adoption of federal non-constitutional error standard as explained in *Kotteakos v. United States*, 328 U.S. 750, 764-765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

After examining the record here, we have a fair assurance that any error did not have a substantial and injurious effect, or influence, in determining the jury's verdict.  At the end of the day the jury had in evidence a pair of jeans that came from his room two days after the murder. The State had also admitted a photograph of the jeans taken during the search of Appellant's room. Appellant never explains how the physical admission of the jeans is any more harmful than the unobjected to photograph of the same pair of jeans.  *See Crocker v. State*, 573 S.W.2d 190, 201 (Tex.Crim.App. 1978)(noting that "[i]t is well established that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged"); *Suiters v. State*, No. 08-11-00048-CR, 2012 WL 4393053, at *6 (Tex.App.--El Paso Sept. 26, 2012, pet. ref'd)(not designated for publication)("A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either

before or after the complained-of ruling."). Moreover, the State never specifically mentioned the jeans in closing argument, and its witnesses spent a minimal amount of time discussing them during trial. The State did cross-examine Appellant, asking him to provide an explanation for GSR *if* found on his jeans. Appellant suggested that smoke from the gun could have gotten on many things inside the mini-van. Appellant's own theory of the case was that another person in the vehicle fired the gun, and even if the jeans indeed had GSR on them, that fact would neither make his theory of the case more or less likely. We overrule Issue Two.

## CLOSING ARGUMENT

In Issues Three and Four, Appellant complains that the State's attorney argued evidence outside the record. Specifically, Issue Three contends that the trial court erred in failing to grant a mistrial after the State mentioned GSR in closing. Issue Four complains that the trial court erred in overruling an objection to argument about fingerprint evidence that was never presented at trial.

### Standard of Review and Applicable Law

Proper jury argument includes (1) summary of the evidence presented at trial, (2) reasonable deductions drawn from that evidence, (3) answers to opposing counsel's arguments, and (4) pleas for law enforcement. *Jackson v. State*, 17 S.W.3d 664, 673 (Tex.Crim.App. 2000). A prosecuting attorney is permitted in argument to draw all inferences from the facts in evidence which are reasonable, fair and legitimate, and offered in good faith. *Cantu v. State*, 939 S.W.2d 627, 633 (Tex.Crim.App. 1997). However, the prosecutor may not use jury argument to get before the jury, either directly or indirectly, evidence which is outside the record. *Borjan v. State*, 787 S.W.2d 53, 57 (Tex.Crim.App. 1990), *citing Jordan v. State,* 646 S.W.2d 946, 948 (Tex.Crim.App. 1983).

We review a trial court's ruling on an objection asserting improper jury argument for an abuse of discretion. *Davis v. State,* 329 S.W.3d 798, 825 (Tex.Crim.App. 2010). Appellant also claims that the trial court erred in overruling a motion for mistrial which we also review for an abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699-700 (Tex.Crim.App. 2007); *Salazar v. State*, 38 S.W.3d 141, 148 (Tex.Crim.App. 2001). The test for an abuse of discretion is whether the trial court acted arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.Crim.App. 1990). A trial court abuses its discretion when its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex.Crim.App. 2008).

To constitute reversible error, a jury argument must have been manifestly improper or must have injected new, harmful facts into the proceedings. *Jackson*, 17 S.W.3d at 673-74; *see also Borjan,* 787 S.W.2d at 57 (an improper jury argument constitutes reversible error when, considering the record as a whole, it is extreme or manifestly improper, violates a mandatory statute, or injects new facts harmful to the accused into the trial proceedings). A trial court's erroneous overruling of a defendant's objection to improper jury argument is a non-constitutional error reviewed under TEX.R.APP.P. 44.2(b); *Maxwell v. State*, 253 S.W.3d 309, 318 (Tex.App.--Fort Worth 2008, pet. ref'd).

When the trial court sustains an objection to an improper jury argument and instructs the jury to disregard the argument, but denies a motion for mistrial, an appellate court must determine whether the trial court abused its discretion by denying the mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex.Crim.App. 2004). In making this determination, we balance the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), the measures adopted to cure any misconduct (the efficacy of any cautionary instruction by the trial court to the

26

jury), and the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *See Mosely v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App. 1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999); *Faust v. State*, No. 08-13-00244-CR, 2015 WL 1735664, at \*4 (Tex.App.--El Paso, Apr. 15, 2015, no pet.)(not designated for publication). A mistrial is the remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Hawkins*, 135 S.W.3d at 77. Mistrial is an appropriate remedy in "extreme circumstances" for a narrow class of highly prejudicial and incurable errors. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex.Crim.App. 2009). Otherwise, when the prejudice is curable, an instruction by the court to disregard eliminates the need for a mistrial. *Young v. State*, 137 S.W.3d 65, 69 (Tex.Crim.App. 2004).

**Reference to Gunshot Residue**

The jury heard evidence that the police swabbed the mini-van for GSR in the driver seat, the front passenger seat, and roof above the passenger and the driver's side of the vehicle. While Appellant was on the stand, the prosecutor also asked him about the possible GSR on his jeans and inside the vehicle. When asked how he would explain any GSR on his jeans or the inside of the mini-van on the driver's side, Appellant answered that while he does not know much about firearms, he "imagine[s] when you fire a projectile, there's smoke and it goes to different parts." We find no other substantive evidence of GSR presented at trial.

In closing argument, the State's prosecutor asked the jury, "But what does he say about the gun residue?" At that point, the trial judge asked the lawyers to approach the bench. The judge reminded the lawyers that there was no evidence of GSR and stated, "Don't bring it up." The prosecutor suggested to the court, however, that Appellant's answers in cross-examination constituted evidence. The trial judge acknowledged that the State "got it in through the back door"

27

but reiterated that there still was no evidence of GSR. When the State's prosecutor persisted, the trial judge informed her to do "whatever you want" but warned the court would entertain an objection. The State's prosecutor then returned to jury argument, with following exchange:

[STATE'S ATTORNY]: Again, I want to tell you -- you'll recall the evidence as you hear it -- on cross-examination Ms. Tarango asked him -- she first asked him if there was gun residue found --

[DEFENSE COUNSEL]: Objection, Your Honor. There's no evidence of scientific evidence of gun residue found.

[COURT]: Sustained.

[DEFENSE COUNSEL]: Your Honor, could we have an instruction to the jury.

[COURT]: Please disregard that argument -- statement.

[DEFENSE COUNSEL]: Motion for mistrial.

[COURT]: Denied.

We would agree that there was no evidence in the record to support an inference that any GSR was found either in the mini-van or on the jeans. It would have been improper for the State's attorney to suggest otherwise. Nonetheless, we are unconvinced that the trial court erred in denying the motion for mistrial. Though we do not condone the State's attorney pressing the matter when the trial judge had effectively ruled, this single instance does not rise to the level of the narrow class of highly prejudicial and incurable errors which require granting a mistrial. *Ocon*, 284 S.W.3d at 884.

Nor is the error reversible under the *Mosley* test. The first factor we look to is the severity of the conduct, which by necessity inquires of its prejudicial effect. *Hawkins*, 135 S.W.3d at 77-78 ("Prejudice is clearly the touchstone of the first factor in the *Mosley* test."). Here, the prosecutor was quickly cut off before she got any further than asking the jurors to recall the GSR testimony. The testimony from Appellant was nothing more than his lay speculation about how GSR could

28

have gotten on anything within proximity of the discharging firearm. Nothing about GSR being found (if it was) inside the mini-van or on his jeans was inconsistent with his theory of the case.

The second factor we consider are the measures adopted to cure any misconduct. In most instances, an immediate instruction to disregard improper remarks will cure the error. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex.Crim.App. 2000); *Amaro v. State*, 08-14-00052-CR, 2016 WL 3344568, at *6 (Tex.App.--El Paso June 14, 2016, no pet.)(not designated for publication). We presume the jury will heed the judge's instructions. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex.Crim.App. 2005); *Wesbrook*, 29 S.W.3d at 116. Here the trial judge not only issued a curative instruction, but *sua sponte* cut the argument off, which the jury likely would have noticed. The jury charge also contained standard instructions informing the jury that statements and questions by counsel do not constitute evidence.

Finally, we consider the other evidence of guilt in our harm analysis. On this record, the GSR testimony was minimal in the overall assessment of guilt and innocence. Two eyewitnesses identified Appellant as the shooter. Appellant's girlfriend confirmed that he was wearing the same distinctive clothes as both eyewitnesses testified. The girlfriend also testified to inculpatory statements that Appellant made shortly after the shooting. She identified the gun used in the shooting as his, and confirmed that he hid it following the shooting. When first confronted by the police, Appellant attempted to escape. His story about Mr. Robinson being the actual shooter contained several elements of implausibility, not the least of which was that Appellant and Mr. Robinson left the scene of the shooting to jump start a car parked two blocks away. The factual issues raised in this case were not close, and we cannot conclude these isolated and corrected statements were likely to change the outcome.

29

**Reference to Fingerprints**

Appellant also complains of the prosecutor's reference to a fingerprint inside a compartment in the mini-van. There was no fingerprint evidence presented at trial, but this exchange occurred as the State's attorney cross-examined Appellant:

> [STATE'S ATTORNEY]: Okay. Isn't it a fact that that gun was your gun and you would keep it in the van in like a little compartment on the side of the door?
>
> [APPELLANT]: No.
>
> [STATE'S ATTORNEY]: Okay. So if Brianna [the girlfriend] were to came [sic] back in later and say that that's where you always kept your gun, that would not be true?
>
> [APPELLANT]: Correct.
>
> [STATE'S ATTORNEY]: And if crime scene officers came and testified that they found a fingerprint inside of that panel matching your fingerprint, what would your explanation be for that?
>
> [APPELLANT]: When Robinson gave me the gun, I had to hide it and I put it there to go back to the house.

During final argument, the prosecutor referenced this exchange and asked the jury to recall Appellant's answer to the question about where he "normally" hid his gun. Appellant's counsel objected, claiming the prosecutor was misstating the evidence. He claimed that there was never an admission that Appellant normally hid his gun there. The trial court overruled the objection, admonishing that the jury would recall the testimony from the witness stand.

From the testimonial exchange, Appellant admitted hiding the gun in the compartment ("I had to hide it and I put it there to go back to the house"). And the prosecutor did no more than ask the jury to recall the testimony given in answer to a question. And while Appellant denied that he "always kept" his gun there, or that the gun was his, the jury was free to believe or disbelieve his answer to that question. It was not error to ask them to recall the answer to a question.

30

## Reference to Mr. Robinson's Alibi

Although not specifically referenced in his two issues addressing the closing argument, Appellant also asks that we consider the prosecutor's reference to the police investigation of Mr. Robinson's alibi as a part of our consideration of his other two arguments. The State never put on any evidence about the police's investigation into Appellant's claim that Mr. Robinson was the actual shooter, but in closing argument the prosecutor made this statement:

> [STATE'S ATTORNEY]: . . . [b]ut he finally admits at the very least that he's the driver, that he helped the real shooter, Mr. Robinson, that, of course, *the police followed up with*. The street works both ways. Defense counsel has every right to subpoena. [Emphasis added].

Appellant concedes that no objection was made to this argument. We address the alibi in Appellant's next issue, but note that any complaint about the prosecutor's argument is forfeited. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App. 1996)(failure to lodge objection to final argument forfeits complaint); *Priester v. State*, 478 S.W.3d 826, 840 (Tex.App.--El Paso 2015, no pet.). We overrule Issues Three and Four.

## CUMMULATIVE ERROR

In Issue Five, Appellant argues that the cumulation of error merits reversal because it deprived him of due process and the right to a fair and impartial jury. The text of the argument focuses mainly on the prosecutors' jury argument and witness examinations. In particular, Appellant contends that witnesses were asked about GSR when the State had no intent of calling a GSR expert to trial. Appellant also complains that questions were asked suggesting that the detectives had established an alibi for Mr. Robinson when no evidence was ever admitted to that effect. As we discuss in the prior issues, Appellant claims that the prosecutor in closing argument asked the jury to recall these questions and answers.

31

While phrased as a "cumulative" error, much of Issue Five actually asserts a prosecutorial misconduct claim. The main thrust is that the prosecutors acted inappropriately, and less that the trial judge erred in making rulings. Moreover, Appellant argues in his brief that the "State knew it was not calling a DPS witness and used [a detective's testimony] to leave a false impression that gunshot residue was seen, collected, and processed by law enforcement." He similarly claims: "From the start, the State knew they were not going to put on evidence of confirmed gunshot residue on either the pants or the van because that evidence did not exist." Regarding the alibi questions, Appellant's brief contends that the State "falsely" asserted the police spoke with Mr. Robinson and confirmed his alibi. He claims more than just error in allowing the question under the rules of evidence; he claims the State "fabricated the existence of Robinson's alibi." (Prosecutorial misconduct rises to a due-process violation when it is so significant that it deprives a defendant of a fair trial. *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987); s*ee also Berger v. United States*, 295 U.S. 78, 84, 88-89, 55 S.Ct. 629, 631, 633, 79 L.Ed. 1314 (1935)(new trial awarded where pronounced and persistent prosecutor misconduct had probable cumulative effect on jury); *Clark v. State*, 365 S.W.3d 333, 338 (Tex.Crim.App. 2012); *Viscaino v. State*, 513 S.W.3d 802, 810-11 (Tex.App.--El Paso 2017, no pet.). Prosecutorial misconduct, however, is an independent basis for an objection that must be specifically urged to preserve error. *Clark*, 365 S.W.3d at 338; *Viscaino*, 513 S.W.3d at 810; *Hajjar v. State,* 176 S.W.3d 554, 566 (Tex.App.--Houston [1st Dist.] 2004, pet. ref'd). The proper method is to (1) object on specific grounds, (2) request an instruction that the jury disregard the comment, and (3) move for a mistrial. *Penry v. State,* 903 S.W.2d 715, 764 (Tex.Crim.App. 1995); *Cook v. State,* 858 S.W.2d 467, 473 (Tex.Crim.App. 1993).

Our first problem is that while some evidentiary objections were made to the cross-examination of which Appellant now complains, no due process objection was ever asserted. We explain why that is important. Appellant claims that the State knew it was not going to call a GSR expert, or that the evidence did not exist, but the appellate record neither confirms or denies that claim. The State designated a witness to testify to GSR. We have no basis to know why the witness was not called, but had the issue been raised below, the trial court could have easily fleshed out the issue. Some record would exist to show whether the State arranged for the witness to testify, or show why and when it was decided to forego calling the expert. Some record would show if the DPS confirmed that the swabs taken from inside the mini-van contained GSR or not.[9]

The same problem plagues Appellant's claim about the "alibi." The State's prosecutor cross-examined Appellant on his claim that Mr. Robinson was the true culprit:

[STATE'S ATTORNEY]: Okay. And so you know, because you've been preparing for this trial and your attorneys have had access to all of our evidence, that the police talked to Mr. Robinson.

[APPELLANT]: No.

[STATE'S ATTORNEY]: You didn't know that?

[APPELLANT]: No.

[STATE'S ATTORNEY]: That they checked out his alibi.

[DEFENSE COUNSEL]: Objection, Your Honor, speculation, also leading and --

---

[9] Nothing in this opinion should be read to condone questioning lay witnesses about GSR where there is no proof of any actual GSR in the first place, nor a predicate for the science behind GSR. When a gun fires, the residual particles from the gunshot primer hit the air, rapidly cool, and then settle on any objects that are nearby, such as potentially the hands or the clothing of the shooter. *Burks v. State*, 03-12-00181-CR, 2014 WL 1285731, at *5 n.8 (Tex.App.--Austin Mar. 26, 2014)(not designated for publication)(discussing science theory of GSR). The GSR analysis identifies the presence of any individual particles that have a mixture of lead, barium, and antimony and have the appearance of being melted. *Id.* Different testing labs have specific standards for the number of particles that must be collected to report a positive GSR finding. *Id.*; *Clark v. State*, 01-13-00373-CR, 2015 WL 162257, at *4 (Tex.App.--Houston [1st Dist.] Jan. 13, 2015, pet. ref'd)(not designated for publication). There are multiple methods for collecting and analyzing the particulates. Robert M. Schoenhaus, *Admissibility, In Criminal Case, of Results of Residue Detection Test to Determine Whether Accused or Victim Handled or Fired Gun*, 1 A.L.R.4th 1072 (1980). None of these matters were developed on this record, and neither the police detective, nor Appellant, appear to have the background to testify to the ultimate significance, if any, of GSR.

THE COURT: Well, she's on cross so she can lead, but overruled on speculation.

[APPELLANT'S COUNSEL]: Thank you, Your Honor.

[APPELLANT]: I'm not understanding.

[STATE'S ATTORNEY]: Do you know that Mr. Robinson had an alibi for that night?

[DEFENSE COUNSEL]: Objection, Your Honor, speculation.

THE COURT: Overruled.

[APPELLANT]: Well, I don't know because I just went to jumpstart his car.

We might agree that as an evidentiary matter, the question assumes facts not in evidence. Yet we have no evidence the State's claim is "false" or "fabricated" such that its conduct rose to a due process violation. Had a prosecutorial misconduct objection been urged below, it might easily enough have been verified through the contents of detective's investigative file. Our record contains none of that material and we decline to simply assume the State's prosecutors fabricated evidence. Because the due process issue was not raised below, the components of Appellant's fifth issue are forfeited.

Looking to the balance of the arguments made, multiple errors may be harmful in their cumulating effect on the defense even if each error would be harmless standing on its own. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex.Crim.App. 1999), *cert. denied*, 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000)(but also explaining that unless and until multiple errors are found to have been committed, there can be no cumulative error effect because non-errors cannot in their cumulative effect create harmful error). The mere existence of multiple errors, however, does not warrant reversal unless they operated in concert to undermine the fundamental fairness of the proceedings. *Estrada v. State*, 313 S.W.3d 274, 311 (Tex.Crim.App. 2010); *see also Murphy v. State*, 112 S.W.3d 592, 607 (Tex.Crim.App. 2003)("Because we have found little or no error in the above-alleged points, there is no harm or not enough harm to accumulate."). If the individual

claims of error lack merit, then there is no possibility of cumulative error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex.Crim.App. 2009); *Chamberlain*, 998 S.W.2d at 238.

As we previously discuss, the other issues for the most part do not demonstrate error. While we have alternatively considered whether some of those issues would have resulted in harmful error, none of the errors even collectively considered, merit reversal. We overrule Issue Five and affirm the conviction below.

July 31, 2018

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.